IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLE S. HALL, | : | No.: 4:06-CV-1101 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Jones |
| | : | |
| GLENN O. HAWBAKER, INC., *et al.*, | : | |
| | : | |
| Defendants. | : | |

## ORDER

November 8, 2006

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before the Court are the Motion of Capital Administrative Services, Inc., to Dismiss Counts I, II, and IV of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss Counts I, II, and IV") (doc. 50), filed on September 29, 2006, and the Motion of Glenn O. Hawbaker, Inc., and the Glenn O. Hawbaker, Inc., Employee Benefit Plan to Dismiss Counts II, IV, and V of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss Counts II, IV, and V") (doc. 56), filed on October 9, 2006.  For the reasons that follow, the Motions will be granted in part and denied in part.

1

**PROCEDURAL HISTORY:**

On May 31, 2006, Plaintiff Nichole S. Hall ("Plaintiff" or "Ms. Hall") filed a

Complaint arising under the provisions of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, in the United States District

Court for the Middle District of Pennsylvania, with Glenn O. Hawbaker, Inc., and

Capital Blue Cross t/d/b/a NCAS Pennsylvania as named Defendants.  (Rec. Doc.

1-1).  Prior to the filing of any Answer(s) or Motion(s) by Defendants, on June 22,

2006, Plaintiff filed an Amended Complaint, also arising under the provisions of

ERISA, 29 U.S.C. § 1001 *et seq.,* and naming Glenn O. Hawbaker, Inc., and

Capital Blue Cross t/d/b/a NCAS Pennsylvania as Defendants.  (Rec. Doc. 5-1).

On June 23, 2006, Plaintiff filed a Motion for Preliminary Injunction requesting

reinstatement of her health insurance.  (Rec. Doc. 6).

Both Defendants then filed Motions to Dismiss portions of the Amended

Complaint (docs. 16, 25), prompting Plaintiff, on September 21, 2006, to file a

Motion to Amend Pleadings (doc. 41-1).  By Order dated September 21, 2006

(doc. 43), this Court granted Plaintiff's Motion to Amend, and on same date,

Plaintiff filed her Second Amended Complaint (doc. 42).  The Second Amended

Complaint also arises under the provisions of ERISA, 29 U.S.C. § 1001 *et seq.*

However, it names as Defendants Glenn O. Hawbaker, Inc., Capital Administrative

2

Services, Inc., t/d/b/a NCAS Pennsylvania, and the Glenn O. Hawbaker, Inc.,

Employee Benefit Plan.

On September 29, 2006, Capital Administrative Services, Inc. ("NCAS"),

filed a Motion to Dismiss Counts I, II, and IV of the Second Amended Complaint

(doc. 50), and on October 9, 2006, Glenn O. Hawbaker, Inc. ("GOH"), and the

Glenn O. Hawbaker, Inc., Employee Benefit Plan ("Plan") filed a Motion to

Dismiss Counts II, IV, and V of the Second Amended Complaint (doc. 56).  Both

of the instant Motions to Dismiss have been briefed by the parties.  The Motions to

Dismiss are therefore ripe for disposition.

## FACTUAL BACKGROUND:

In her Second Amended Complaint, Plaintiff seeks various forms of relief.

(Rec. Doc. 42).  However, the principal forms of relief sought are a declaratory

judgment that the divorce decree entered on or about September 9, 2005 was the

qualifying event entitling her to elect "COBRA" coverage pursuant to the

Consolidated Omnibus Budget Reconciliation Act, the reinstatement of her

dependent health insurance coverage through GOH until September 9, 2005, the

opportunity to make any and all insurance payments required were Plaintiff

entitled to elect COBRA coverage after September 9, 2005, and Defendants'

payment of any and all medical bills that Plaintiff incurred from June 15, 2005 to

the present.  The aforementioned health insurance, available as part of the Plan, is a self-funded employee benefit plan for employees and beneficiaries of GOH.  (Rec. Doc. 42, ¶ 4).

Plaintiff alleges that NCAS was a named fiduciary and the claims administrator for the Plan.  (Rec. Doc. 42, ¶ 8).  Plaintiff alleges that GOH was the sponsor of the Plan, the plan administrator, and a named fiduciary.  (Rec. Doc. 42, ¶ 7).  However, Plantiff alleges that GOH is also the "defacto [sic] decision maker on granting or denying continued health insurance coverage" to Plaintiff.  (Rec. Doc. 42, ¶ 9).

On November 7, 1993, Plaintiff and Michael Hall ("Mr. Hall") married.  (Rec. Doc. 42, ¶ 10).  At all times relevant to the instant dispute, Mr. Hall was employed by GOH.  (Rec. Doc. 42, ¶ 6).  As an employee of GOH, Mr. Hall was entitled to employee benefits, including health insurance, from the Plan.  (Rec. Doc. 42, ¶ 6).  Although Plaintiff does not specifically aver when she first obtained health insurance under the Plan, Plaintiff had health insurance through GOH for some period of time prior to the events leading to this dispute.  (Rec. Doc. 42, ¶ 14).

While Plaintiff was insured under the Plan, she was the victim of recurrent thyroid cancer.  (Rec. Doc. 42, ¶ 14).  During her coverage under the Plan, Ms.

4

Hall had two surgeries and multiple tests related to her cancer, allegedly costing the Plan tens of thousands of dollars.  (Rec. Doc. 42, ¶ 15).

In 2004, Mr. Hall filed for divorce from Plaintiff in New York.  (Rec. Doc. 42, ¶ 11).  On January 6, 2005, Mr. Hall and Plaintiff signed a Separation Agreement relating to equitable distribution of their marital property.  (Rec. Doc. 44-1, Ex. B).  The Separation Agreement[1] provided that the parties would "agree to remain separated . . . for a period of six (6) months after the execution of the Agreement, or June 1, 2005, so that the Wife can continue to obtain medical insurance for that period of time from the [H]usband."  (Rec. Doc. 44-1 at 15).

On or about June 15, 2005, Mr. Hall completed an NCAS Termination Notification Form in which he described his marital status as "Single" and indicated that health insurance coverage for his "Ex Wife" should be terminated because of "Divorce or Legal Separation."  (Rec. Doc. 44-2, Ex. C).  Mr. Hall also denoted June 15, 2005 as the date of the qualifying event and the date on which coverage should terminate.  (Rec. Doc. 44-2, Ex. C).

As a result of Mr. Hall's completion of the NCAS Termination Notification

---

[1] As NCAS accurately noted, because Plaintiff attached the Separation Agreement as an Exhibit to her Second Amended Complaint, the Court may consider its contents in resolving the instant Motions.  See Lum v. Bank of America, 361 F.3d 217, 222 n.3 (3d Cir. 2004).  Indeed, in its disposition of the instant Motions, the Court may consider the contents of all Exhibits that Plaintiff attached to her Second Amended Complaint.

Form, on or about June 21, 2005, NCAS sent the required COBRA Qualifying

Event Notification ("Notification") to Ms. Hall.  (Rec. Doc. 44-2, Ex. D).  The

Notification indicated that Ms. Hall's coverage under the Plan terminated June 15,

2005.  (Rec. Doc. 44-2, Ex. D at 1).

Plaintiff alleges that the Notification informed her that she had forty-five

(45) days in which to elect to continue health insurance benefits or have them

terminated.  (Rec. Doc. 42, ¶ 25).  However, the Notification actually says that

"[t]o continue coverage, you must complete and submit the application that is

enclosed with this letter to NCAS within 60 days from either the date of this letter

or your coverage term date (whichever is later)."  (Rec. Doc. 44-2, Ex. D at 1).

The Notification then itemized the premiums for the types of coverage available,

including a total of $350.22 for individual medical and dental coverage, and further

advised: "[y]our completed application should include a premium payment in order

to activate coverage that terminated on the termination date listed above."  (Rec.

Doc. 44-2, Ex. D at 1).

Plaintiff alleges that she then contacted NCAS, which advised her to send a

monthly premium of $350.22.  (Rec. Doc. 42, ¶ 26).  Accordingly, on or about July

29, 2005, NCAS received a Continued Group Health Coverage Application

("COBRA Application"), selecting continued individual medical and dental

insurance, and containing a $350.22 COBRA payment, from Ms. Hall.  (Rec. Doc. 44-2, Ex. E).  On her COBRA Application, Ms. Hall designated her marital status as "Sep[a]rated."  (Rec. Doc. 44-2, Ex. E).

On August 16, 2005, Plaintiff received notice that she had to pay $537.01 by next month's closing date to bring her account current.  On or about September 7, 2005, NCAS received the $537.01 payment requested.  (Rec. Doc. 42, ¶¶ 29-30). If the qualifying event occurred on June 15, 2005, the $537.01 payment brought Plaintiff's account current through August 31, 2005.  (Rec. Doc. 42, ¶ 30).

However, Plaintiff alleges that the qualifying event did not take place until September of 2005.  On September 7, 2005, a decree of divorce was issued in New York, which incorporated the Separation Agreement signed in January and filed in September.  (Rec. Doc. 44-1, Ex. A).  The divorce decree was entered on September 9, 2005.  (Rec. Doc. 42, ¶ 19).

Plaintiff alleges that on or about early September of 2005, Plaintiff's fiancé, Paul Morris ("Mr. Morris"), had a telephone conversation with NCAS about the status of Ms. Hall's payments.   (Rec. Doc. 42, ¶ 58).  Plaintiff alleges that NCAS advised Mr. Morris that Ms. Hall's payments were current.  (Rec. Doc. 42, ¶ 58). Indeed, Plaintiff alleges that NCAS failed to inform Mr. Morris that Ms. Hall's September payment had been due on August 15, 2005, and that Defendants

7

considered her September payment in arrears.  (Rec. Doc. 42, ¶ 58).  Further,

Plaintiff alleges that "the defendant"[2] knew that Plaintiff's account was in arrears

and that Plaintiff did not know it when "the defendant" failed to disclose that

information to Mr. Morris in early September.  (Rec. Doc. 42, ¶¶ 68-69).

However, on September 15, 2005, NCAS sent Plaintiff written notice that

her premiums were in arrears as of August 29, 2005, in the amount of $350.22.

(Rec. Doc. 42, ¶ 59).  The September 15, 2005 notice also allegedly advised

Plaintiff that her "continuation of coverage may be cancelled as of next month's

closing date if this balance is not paid," thus indicating to Plaintiff that if payment

was not received by October's closing date, insurance may be cancelled.  (Rec.

Doc. 42, ¶¶ 59, 62).

Plaintiff also alleges that, contrary to the Plan's COBRA Administration

Service Rider, the September 15, 2005 notice failed to indicate that if payment was

not made by October 1, 2005, NCAS intended to cancel her COBRA insurance

retroactive to August 31, 2005, the last date through which payments were timely.

(Rec. Doc. 42, ¶¶ 60-61).  Plaintiff alleges that the Plan documents contain a

COBRA Administration Service Rider, which provides that if a participant is late

---

[2] Count I names NCAS and GOH as Defendants.  However, in her allegations within Count I, Plaintiff fails to specify which Defendant to which the singular, "the defendant," allegations refer.  Given Plaintiff's allegation that Mr. Morris called NCAS (doc. 42, ¶ 67), this Court assumes that any reference to "the defendant" within Count I refers to NCAS.

with payment, "NCAS shall notify the COBRA continuant in writing.  If NCAS does not receive a full premium payment within thirty days from the date of the notice, NCAS shall cancel the COBRA continuant retroactive to the first day of the period for which timely payment has not been made . . . ."  (Rec. Doc. 42, ¶ 61).

Plaintiff alleges that Mr. Morris mailed her September payment, in the amount of $350.22, on or about September 26, 2005.  (Rec. Doc. 42, ¶ 33).  Plaintiff also alleges that Mr. Morris mailed the payment for October, also in the amount of $350.22, on or about October 1, 2005.  (Rec. Doc. 42, ¶ 34).

However, on or about October 12, 2005, Plaintiff received a Certificate of Health Insurance Creditable Coverage for the period of June 15, 2005 through August 31, 2005.  (Rec. Doc. 42, ¶ 35).  Further, on October 12, 2005, Plaintiff also received notice that her insurance was being cancelled for non-payment and was notified that she could contact the NCAS COBRA department via telephone in regards to the termination.  (Rec. Doc. 42, ¶ 36).  Plaintiff also alleges that on October 13, 2005, she received a second, written notification from NCAS about the termination.  (Rec. Doc. 42, ¶ 37).

Plaintiff avers that she made repeated telephone calls to NCAS about her termination, and that she was advised that GOH would determine whether to reinstate her insurance.  (Rec. Doc. 42, ¶ 38).  However, Plaintiff alleges that when

she contacted GOH, she was informed that NCAS would determine whether to reinstate her insurance.  (Rec. Doc. 42, ¶ 40).  Plaintiff also alleges that an attorney working on her behalf left messages with NCAS's customer service department, but received no return calls as of October 27, 2005.  (Rec. Doc. 42, ¶ 40).

Thus, on or about October 27, 2005, Plaintiff, through her attorney, advised NCAS that she had made the September and October premium payments via checks dated September 26, 2005, and October 1, 2005, respectively.  (Rec. Doc. 42, ¶ 41).  Plaintiff also alleges that her attorney advised NCAS that Plaintiff had not received "any notice that the September payment was in arrears"[3] and requested that her benefits be reinstated.  (Rec. Doc. 42, ¶ 41).

Although Plaintiff fails to allege when her thyroid cancer recurred, Plaintiff is currently fighting cancer.  (Rec. Doc. 42, ¶ 16).  "[S]ignificant testing and expense is necessary for her further treatment."  (Rec. Doc. 42, ¶ 16).

---

[3] The Court notes that Plaintiff's allegation that she had no notice (doc. 42, ¶¶ 41-42, 68 ("no notice of this premium due was sent to the plaintiff")) may be contradicted by Plaintiff's allegation that on September 15, 2005, NCAS sent notice that the September premium was in arrears (doc. 42, ¶¶ 59-60).  The allegations would not conflict if Plaintiff had also alleged that she never received the September 15, 2005 notice, but Plaintiff made no clear allegation of such.  The allegation most nearly suggesting that Plaintiff never received such notice is contained in ¶ 49, where Plaintiff refers to "copies of notifications of late payments *allegedly* sent to Ms. Hall on or about August 16, 2005 and September 15, 2005."  (Rec. Doc. 42, ¶ 49 (emphasis added)).  However, several of Plaintiff's other allegations tend to suggest that she received it.  (See Rec. Doc. 42, ¶¶ 60, 91-95).

Regardless of whether Plaintiff alleges that she received the September 15, 2005 notice or not, in ¶ 59, Plaintiff appears to concede that NCAS sent such notice.  (Rec. Doc. 42, ¶ 59).

Accordingly, Plaintiff's efforts to have her insurance reinstated continued. (See Rec. Doc. 44-2, Exs. H-J). On or about February 6, 2006, Plaintiff again contacted NCAS, through her attorney, to advise NCAS that Plaintiff had sent the September and October premiums, was continuing to send monthly premiums, had not received notice that she was in arrears, and requested reinstatement of her insurance benefits. (Rec. Doc. 42, ¶ 42). The February 6, 2006 letter also requested a written explanation as to the continued denial of Plaintiff's insurance coverage and copies of all documents relating to the denial. (Rec. Doc. 42, ¶ 43). A similar letter was sent on February 16, 2006. (Rec. Doc. 42, ¶ 45). The February 16, 2006 letter also advised NCAS that the qualifying event had not occurred in June of 2005, but rather when the parties were divorced on September 9, 2005, and argued that Plaintiff should have been covered by Mr. Hall's insurance until that date. (Rec. Doc. 44-2, Ex. J).

On or about February 27, 2006, NCAS advised Plaintiff that her written appeal had been forwarded to GOH and that a detailed response would be forthcoming from the group's broker of record. (Rec. Doc. 42, ¶ 46). On or about March 8, 2006, a memorandum from GOH was received by Plaintiff, indicating the qualifying event for termination as divorce or legal separation, listing a chronology of events regarding Plaintiff's claim, and providing some supporting documents.

(Rec. Doc. 42, ¶¶ 47, 48).  However, no summary plan, insurance policy, or file was included with the memorandum.  (Rec. Doc. 42, ¶ 47).

As a result, on March 21, 2006, Plaintiff's attorney requested "copies of notifications of late payments allegedly sent to Ms. Hall on or about August 15, 2005 and September 15, 2005."  (Rec. Doc. 42, ¶ 49).  Plaintiff's attorney also requested a formal response to her appeal letter, the reasons her insurance continued to be denied, and notice of any further administrative appellate right Plaintiff might have.  (Rec. Doc. 42, ¶ 50).  Plaintiff alleges that as of September 21, 2006, no formal response from NCAS has been received, and thus, any further administrative appeal would be fruitless.  (Rec. Doc. 42, ¶ 51).

Plaintiff also alleges that NCAS's records indicate receipt, by NCAS, of two premium payments from Plaintiff on October 13, 2005, "said payment bringing Ms. Hall's account status from being in arrears to being paid under the defendant's billing system."  (Rec. Doc. 42, ¶ 63).  Further, Plaintiff alleges that pursuant to both the terms of the Agreement for Third Party Administration Services between GOH and NCAS, and the September 15, 2005 notice, she had thirty (30) days from the September 15, 2005 notice to bring her account current.  (Rec. Doc. 42, ¶ 64).  Thus, Plaintiff alleges that Defendants untimely rejected any payment(s) received on or about October 13, 2005, two days prior to the alleged October 15, 2005

12

deadline, and cancelled Plaintiff's insurance prematurely.  (Rec. Doc. 42, ¶ 65).

This Court has jurisdiction over this action pursuant to 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1331 because this is an action to recover benefits under a medical expense benefit plan covered by ERISA and arises under the laws of the United States.

## STANDARD OF REVIEW:

In considering a motion to dismiss, a court must accept the veracity of a plaintiff's allegations.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990).  In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that in considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims."  Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also District Council 47 v. Bradley, 795 F.2d 310 (3d Cir. 1986).

## DISCUSSION:

In its Motion, NCAS seeks dismissal of Counts I, II, and IV of the Second

Amended Complaint for failure to state a claim upon which relief can be granted. (Rec. Doc. 50 at 1).  NCAS asserts that Count I of the Second Amended Complaint should be dismissed for failure to state a claim because Plaintiff "does not and could not allege that Ms. Hall 'reasonably relied' on any misstatement by NCAS," and that Count II should be dismissed for failure to state a claim because NCAS is not a proper defendant to Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim and because NCAS gave proper COBRA notice at the proper time.  Further, NCAS argues that Count IV should be dismissed for failure to state a claim because it "essentially reiterates the incorrect theory . . . " underlying Count II.  (Rec. Doc. 51 at 5).

GOH and the Plan's Motion seeks dismissal of Counts II, IV, and V of the Second Amended Complaint for failure to state a claim upon which relief can be granted.  (Rec. Doc. 56 at 1).  GOH argues that Count II should be dismissed for failure to state a claim because GOH is not a proper defendant relative to Plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim and because GOH had no duty to investigate Mr. Hall's notice of a qualifying event.  GOH and the Plan also assert that Counts IV and V, respectively, should also be dismissed for failure to state a claim because they "essentially reiterate[] the incorrect theory underlying Count II . . . ."[4]  (Rec.

---

[4] The Court has noted the Plan's wish to join GOH's Motion to Dismiss Counts II and IV to the extent that Plaintiff asserted any claim(s) against it in the aforementioned Counts.  (Rec. Doc. 57 at 26 n.10).  Because this Court finds that the only named Defendants to Counts II and IV are NCAS and GOH (doc. 42 at 13, 15), this Court sees no need for the Plan to join in said

Doc. 57 at 23).

For the sake of clarity and in the interest of being concise, this Court will consider the Motions to Dismiss by Count.

## A.    NCAS's Motion to Dismiss Count I

In Count I, Plaintiff alleges a breach of fiduciary duty, naming NCAS and GOH as Defendants.[5]  (Rec. Doc. 42 at 12).  NCAS has moved that Count I be dismissed for failure to state a claim because of Plaintiff's failure to allege detrimental reliance.

NCAS aptly notes that the Third Circuit has held that, to make out a claim under ERISA, 29 U.S.C. § 1001, *et seq.*, for breach of fiduciary duty, a plaintiff must plead and prove:

> (1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on the misrepresentation.

Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. &

---

Motion as to the aforementioned Counts.

[5] Despite naming NCAS and GOH as Defendants in Count I, within said Count, Plaintiff only explicitly avers involvement of NCAS, and, in fact, the majority of averments in the Count reference only "the defendant."  Nevertheless, only NCAS has moved the Court to dismiss Count I.

Research Found., 334 F.3d 365, 384 (3d Cir. 2003).[6]  In fact, recently the Third Circuit reiterated the need for ERISA plaintiffs to plead and prove reliance to sustain a claim for breach of fiduciary duty.  See Hooven v. Exxon Mobil Corp., No. 05-1610, 2006 U.S. App. LEXIS 26011 at *11 (3d Cir. Oct. 20, 2006) ("[d]etrimental reliance on a material misrepresentation made by the defendant is a necessary element of an ERISA breach of fiduciary duty claim.").

In Count I, as NCAS indicated, Plaintiff alleges several dates as the potential final date by which her September premium had to be received in order for her COBRA coverage to continue.  Paragraph 32 suggests the September premium was due by the end of September, paragraph 60 suggests that it was due by October 1, 2005, and paragraph 64 suggests that it was due by October 15, 2005.[7]  (Rec. Doc. 42, ¶¶ 32, 60, 64).  As NCAS astutely notes, all of the dates suggested are *after* Mr. Morris's alleged September 26, 2006 payment.  Thus, NCAS argues that Plaintiff

---

[6] The Court recognizes that NCAS does not concede that it was acting as a fiduciary with respect to the alleged conversation with Mr. Morris.  (See Rec. Doc. 51 at n.5).

[7] NCAS (see doc. 62 at 6) and GOH (see doc. 63 at 13) argue that Plaintiff's allegations and argument (docs. 42, ¶¶ 59-62; 61 at 11) that "Plan documents provide a thirty day period in which to make payment from the late notice" (doc. 61 at 15) should fail because the documents cited are not actually plan documents.  Given Plaintiff's multiple allegations as to the final date by which her September premium had to be received in order for her COBRA coverage to continue, and that at least one of those allegations references "Plan documents" (doc. 42, ¶ 61), this Court will reserve ruling on the question of the final deadline until after the upcoming hearing on Plaintiff's Motion for Preliminary Injunction.  (Rec. Doc. 6).  The Court emphasizes that in its disposition of a motion to dismiss, it must consider whether Plaintiff could show *any* facts in support of her allegations that would entitle her to relief.

16

has not, indeed could not, plead detrimental reliance.

However, when disposing of NCAS's Motion to Dismiss Count I, this Court must consider whether Plaintiff could prove any set of facts that would entitle her to relief.[8]  In Count I, Plaintiff alleges that "plaintiff inquired of NCAS in early September 2005 as to the amount of health insurance premium owed.  Plaintiff was informed that the premiums were paid."  (Rec. Doc. 42, ¶ 67).  Plaintiff also alleges that on September 26, 2005, and October 1, 2005, her fiancé, Mr. Morris, mailed Plaintiff's $350.22 premium payments for September and October.  (Rec. Doc. 42, ¶¶ 33-34).  Further, Plaintiff alleges that NCAS received the aforementioned payments on October 13, 2005, and that these payments brought "Ms. Hall's account status from being in arrears to being paid under the defendant's billing system."  (Rec. Doc. 42, ¶ 63).  Finally, as indicated above, two of Plaintiff's allegations suggest that her September premium had to be received prior to October 13, 2005: Paragraph 32 suggests the September premium was due by the end of September and paragraph 60 suggests that it was due by October 1, 2005.  (Rec. Doc. 42, ¶¶ 32, 60).

---

[8] In light of the conflicting final due dates alleged by Plaintiff and Plaintiff's allegation that her premium for September was mailed on September 26, 2005, this Court is not unsympathetic to NCAS's argument that detrimental reliance has not been pleaded.  However, given the standard of review that this Court must apply to motions to dismiss, for each Count, the Court considers whether Plaintiff could prevail if she proved the deadline most favorable to that Count.

Given Plaintiff's conflicting allegations, it is entirely unclear to this Court what was the final date by which NCAS had to receive Plaintiff's September payment in order to prevent the termination of her COBRA coverage. Such a fact-specific inquiry is not the proper subject of a motion to dismiss, and as such, the Court cannot grant NCAS's Motion to Dismiss. However, the Court is confident that those factual circumstances will be more fully developed at the upcoming hearing on Plaintiff's Motion for Preliminary Injunction.[9] (Rec. Doc. 6).

At the upcoming hearing, Plaintiff will have the opportunity to prove a set of facts to support her claims that she is entitled to relief. The key facts in such a determination will be when Plaintiff's September premium was received by NCAS[10] and the last date by which it had to be received by NCAS in order for Plaintiff's COBRA coverage to continue.[11] If Plaintiff shows that her September

---

[9] If, as NCAS suggests (see doc. 62 at 4 n.4), the hearing reveals that Plaintiff's September payment was due August 15, 2005, and that Plaintiff had a thirty (30) day grace period running from the first day of the covered month (September), then Plaintiff's grace period lasted through the end of September.

[10] Given that Plaintiff alleges misrepresentations by NCAS, NCAS's argument that Plaintiff's alleged mailing of her September 26, 2006 premium would have resulted in their receipt of such payment prior to the final deadline may be inapposite. Consideration of NCAS's argument necessarily involves a credibility determination that cannot be made at this juncture.

[11] Depending on this Court's findings as to when Plaintiff's September premium was received by NCAS and what was the last date by which it had to be received by NCAS in order for Plaintiff's COBRA coverage to continue, any alleged misrepresentations by NCAS may then become determinative as well.

18

premium was received by NCAS on October 13, 2005; that, according to Plan

documents, the final date on which it could be received in order for her COBRA

coverage to continue was any date prior to that; and that Plaintiff's mailing of her

September premium, and thus NCAS's receipt, was delayed by any NCAS

misrepresentations of her account status, Plaintiff may have a claim for detrimental

reliance.

Accordingly, NCAS's Motion to Dismiss Count I is denied.  Count I is not

dismissed for failure to state a cause of action because a dispute exists as to the last

date by which payment could be received in order to maintain Plaintiff's COBRA

coverage[12] and a dispute exists as when Plaintiff's premium was sent and received.

Depending on which facts Plaintiff proves, Plaintiff could show that she

detrimentally relied on NCAS's alleged misrepresentation in early September 2005

that her account was up to date.

### B.      NCAS and GOH's Motions to Dismiss Count II

### 1.      Plaintiff's Claims under 29 U.S.C. § 1132(a)(1)(B)

First, we will consider NCAS and GOH's arguments that they are not proper

---

[12] Plaintiff alleges that several different deadlines are referenced in relevant documents. (See Rec. Doc. 42, ¶¶ 32, 60, 64).

defendants for a claim under 29 U.S.C. § 1132(a)(1)(B).[13]  As Defendants submit,

ERISA sets forth the persons entitled to bring a claim for relief, as well as the

specific claims that are authorized.  Specifically, ERISA's Civil Enforcement

section states, in pertinent part, as follows:

> (a) Persons empowered to bring a civil action.  A civil action may be
> brought–
>   (1) by a participant or beneficiary . . .
>    (B) to recover benefits due to him under the terms of his plan, to
> enforce his rights under the terms of the plan, or to clarify his rights to
> future benefits under the terms of the plan . . .
>    (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or
> practice which violates any provision of this title or the terms of the
> plan, or (B) to obtain other appropriate equitable relief (i) to redress
> such violations or (ii) to enforce any provisions of this title or the
> terms of the plan . . . .

29 U.S.C. § 1132(a).  ERISA also provides, in relevant part:

> Any money judgment under this title against an employee benefit plan shall
> be enforceable only against the plan as an entity and shall not be enforceable
> against any other person unless liability against such person is established in
> his individual capacity under this title.

29 U.S.C. § 1132(d)(2).

In Count II of her Second Amended Complaint, Plaintiff alleges that

---

[13] The Court is cognizant that NCAS and GOH's Motions to Dismiss Count II on the grounds that they were improper defendants (docs. 51 at 14; 62 at 5; 63 at 4) sought dismissal of only those claims within Count II brought pursuant to 29 U.S.C. § 1132(a)(1)(B).  However, because Count II contains both 29 U.S.C. § 1132(a)(1)(B) and 29 U.S.C. § 1132(a)(3) claims, in the interest of completeness and clarity, the Court contrasts its treatment of 29 U.S.C. § 1132(a)(1)(B) claims with that of 29 U.S.C. § 1132(a)(3) claims.

Defendants' incorrect determination that a qualifying event, namely legal separation or divorce, terminated Plaintiff's insurance on June 15, 2005, resulted in Plaintiff's receipt of a COBRA notice months before it should have been issued. (Rec. Doc. 42, ¶¶ 73-75).  Because the Halls' divorce decree was entered September 9, 2005, Plaintiff alleges that she was entitled to elect COBRA coverage for at least sixty (60) days after same date, until at least November 9, 2005.  In fact, Plaintiff alleges that because Defendants' notice of termination was legally insufficient and factually incorrect, Plaintiff was entitled to benefits under her husband's insurance on October 13, 2005, the date on which her COBRA coverage was terminated.  Accordingly, in Count II, Plaintiff seeks:

> a) declaratory judgment; b) attorney's fees c) finding that the qualifying event was the divorce decree entered on or about September 9, 2005; d) reinstating the health insurance coverage provided by Glenn O. Hawbaker, Inc., to the plaintiff Nichole Hall as of June 15, 2005; e) that Ms. Hall be allowed to make any and all insurance premium payments that would be required under the insurance contract as fo the order of the court; and f) that the defendants be responsible for any and all medical bills incurred by Nichole Sue Hall from June 15, 2005 to the present pursuant to 29 U.S.C. § 1132(a)(3) and 1132(a)(1).

(Rec. Doc. 42 at 14-15).

As the District Court for the Eastern District of Pennsylvania recently stated, the language of 29 U.S.C. §§ 1132(a)(1)(B) and 1132(d), read together, clearly and unambiguously provides that the plan is the only entity against whom claims for

benefits under the plan may be brought.  <u>Guiles v. Metropolitan Life Ins. Co.</u>, 2002

U.S. Dist. LEXIS 2393 *3 (E.D. Pa. 2002); <u>see</u> <u>also</u> <u>Gelardi v. Pertec Computer</u>

<u>Corp.</u>, 761 F.2d 1323, 1324-25 (9th Cir. 1985).  Moreover, a participant or

beneficiary cannot bring an action under § 1132(a)(3) for "other appropriate

equitable relief" when all they seek is past due benefits.  <u>See</u> <u>Blahuta-Glover v.</u>

<u>Cyanamid Long Term Disability</u>, 1996 WL 220977 *5 (E.D. Pa. 1996) ("Because

§ 1332(a)(1)(B) provides an adequate remedy, a claim for equitable relief for an

alleged simple wrongful denial of benefits cannot be maintained under §

1332(a)(3).").

Count II of the Second Amended Complaint reveals that Plaintiff is seeking

equitable relief, pursuant to 29 U.S.C. § 1132(a)(3), as against Defendants NCAS

and GOH.  <u>See</u> <u>Reinert v. Giorgio Foods, Inc.</u>, 1997 U.S. Dist. LEXIS 9090 *15-16

(E.D. Pa. 1997); <u>see</u> <u>also</u> <u>Spain v. AETNA Life Ins. Co.</u>, 13 F.3d 310, 312 (9th Cir.

1993) (stating that ERISA allows equitable relief against fiduciaries and

nonfiduciaries).  Because Plaintiff is not alleging a "simple wrongful denial of

benefits," <u>see</u> <u>Blahuta-Glover</u>, 1996 WL 220977 *5 (E.D. Pa. 1996), but rather that

multiple alleged errors by Defendants require injunctive relief in order for Plaintiff

to be made whole, Plaintiff's allegations explain her attempt to seek equitable

relief.

Nevertheless, Plaintiff's claims under 29 U.S.C. §§ 1132(a)(1)(B) are dismissed because the Plan is the only appropriate defendant to these claims. Guiles, 2002 U.S. Dist. LEXIS 2393; see also Gelardi, 761 F.2d at 1324-25. Given this Court's finding that neither NCAS nor GOH are proper Defendants to Plaintiff's claims brought pursuant to 29 U.S.C. § 1132(a)(1)(B), this Court need not consider Plaintiff's argument that under 29 U.S.C. § 1132(a)(1)(B), Plan documents can, and do, provide Plaintiff protection beyond that provided by ERISA. (See Rec. Doc. 60 at 12).

Thus, after a thorough review of the plain language of the Second Amended Complaint and applicable case law, the Court will grant NCAS and GOH's Motions to Dismiss those claims in Count II brought pursuant to 29 U.S.C. § 1132(a)(1)(B). Guiles, 2002 U.S. Dist. LEXIS 2393; see also Gelardi, 761 F.2d at 1324-25.

### 2.    Plaintiff's Claims under 29 U.S.C. § 1132(a)(3)

With regard to Plaintiff's 29 U.S.C. § 1132(a)(3) claims in Count II, we will now consider NCAS and GOH's arguments that Plaintiff cannot prevail on them as a matter of law because NCAS provided Ms. Hall proper COBRA notice at the proper time. Defendants argue that they had no duty to research the accuracy of Mr. Hall's representation on the NCAS Termination Notification Form that a

qualifying event, namely a divorce or legal separation, had taken place on June 15, 2005.  Further, Defendants argue that, in fact, the qualifying event occurred on June 15, 2005 because that is the date that Mr. Hall told Defendants that it occurred.  NCAS also argues in the alternative that, even if a qualifying event occurred in September 2005, NCAS was not required to provide Ms. Hall COBRA notice at that time because neither she nor Mr. Hall gave notice of a qualifying event.

Plaintiff counters with three arguments that she claims entitle her to "her husband's dependent health insurance coverage until the date of the divorce decree, or September 9, 2005." (Rec. Doc. 60 at 18).  Accordingly, Plaintiff asserts that when her COBRA coverage was terminated on October 12, 2005, "she was still within the election period to elect continuing coverage, had elected continuing coverage, and had prepaid two and one-half months of insurance premiums." (Rec. Doc. 60 at 18).  First, Plaintiff argues that on June 15, 2005, Plaintiff was entitled to dependent coverage under Mr. Hall's health insurance, pursuant to the terms of the Plan and ERISA, because no qualifying event, i.e. divorce or legal separation, occurred on said date.  Second, Plaintiff argues that her COBRA Application provided NCAS and GOH notice that the Halls' were separated and, thus, that no qualifying event had occurred on June 15, 2005.  Third, Plaintiff argues that she

provided NCAS adequate notice of the entry of the September 9, 2005 divorce

decree, the alleged true qualifying event, in February 2006.

We will first consider Plaintiff's theory that the qualifying event occurred on

June 15, 2005.  As NCAS and GOH submit, under ERISA, both the employee or

the qualified beneficiary and the plan administrator bear responsibility for

providing notice to one another of important dates.  29 U.S.C. § 1166(a)(3)

outlines the notice that employees and beneficiaries are required to provide.  It

states: "each covered employee or qualified beneficiary is responsible for notifying

the administrator of the occurrence of any qualifying event . . . within 60 days after

the date of the qualifying event."  29 U.S.C. § 1166(a)(3).  A "qualifying event" is

defined as "any of the following events which, but for the continuation coverage

required under this part, would result in the loss of coverage of a qualified

beneficiary: . . . (3) [t]he divorce or legal separation of the covered employee from

the employee's spouse."  29 U.S.C. § 1163.

After the employee or beneficiary has provided the required notice of a

qualifying event, 29 U.S.C. § 1166(a)(4) indicates that the plan administrator "shall

notify . . . (B) in the case of a qualifying event described in paragraph (3) or (5) of

section 603 where the covered employee notifies the administrator under paragraph

(3), any qualified beneficiary with respect to such event, of such beneficiary's

rights under this subsection . . . ."  29 U.S.C. § 1166(a)(4).  Thus, Defendants argue

that the employee or qualified beneficiary's notice triggers the plan administrator's

obligation to provide the impacted beneficiary with the required COBRA notice

outlining their rights and obligations.  (See Rec. Docs. 51 at 16; 57 at 16).

Because there is no case law on point from the Court of Appeals for the

Third Circuit, we look to our Sister Circuits for guidance in interpreting the

aforementioned ERISA provisions.  Both NCAS and GOH argue that this Court

should follow the Second Circuit's holding that "[i]t is the act of the employee

telling his employer that the qualifying event has occurred-not the actual

occurrence of the qualifying event itself-that triggers the employer's notice

obligations under COBRA."  Philips v. Saratoga Harness Racing, Inc., 240 F.3d

174, 178 (2d Cir. 2001).

In Philips, the Second Circuit's reasoning included consideration of the text

of the aforementioned ERISA provisions, precedent, and public policy.  See

Philips, 240 F.3d at 178-179.  When considering the issue of whether an invalid

divorce is actually a qualifying event, the Second Circuit surveyed the applicable

case law, including a case from the Eighth Circuit, see Lincoln Gen. Hosp. v. Blue

Cross/Blue Shield of Nebraska, 963 F.2d 1136 (8th Cir. 1992) ("under COBRA, if

the notice of the divorce is given to the employer by the covered employee, the

plan administrator is required to provide the qualified beneficiary with notice of her rights to continue coverage.").  The Second Circuit then concluded that "[t]he unifying thread running through the cited cases is the notion that the notice of a qualifying event is the dispositive factor in determining whether an employer's COBRA obligations have attached."  240 F.3d at 178.

The Second Circuit also indicated that "a cursory examination of § 1163 reveals that whether or not a 'qualifying event' has occurred (such as a 'divorce or legal separation') . . . often requires a legal determination."  Id. at 179.  Citing the Supreme Court's ruling that "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with legislative purpose are available," Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 575 (1982), the Second Circuit concluded that "public policy is best served by relieving health plan administrators of the responsibility for making legal judgments."  240 F.3d at 179.

Finally, the Second Circuit also considered the remedial purpose of COBRA, which "was enacted as a legislative response to the growing number of Americans without health insurance and the reluctance of hospitals to treat the uninsured."  Id. (citations omitted).  The Second Circuit reasoned that "[i]f an employer can avoid COBRA's notice requirements simply by challenging the legal predicate for a

27

qualifying event of which it was notified, the Congressional purpose of keeping affordable health insurance available will be thwarted."  Id.

The only other Court of Appeals' decision on this issue is that cited by Plaintiff in her Briefs in Opposition to Defendants' Motions to Dismiss, Simpson v. T.D. Williamson, Inc., 414 F.3d 1203 (10th Cir. 2005).  Plaintiff argues that Simpson holds that "a divorce or 'legal separation' is the qualifying event that terminates health insurance and gives a beneficiary the right to continuation of COBRA insurance under ERISA."  (Rec. Doc. 60 at 15).  Further, Plaintiff indicated that Simpson concluded that "'legal separation' is uniformly understood to mean a formal 'judicial alteration of the marital relationship' and that a separation of the husband and wife was not a triggering event for the cancellation of family health insurance or COBRA notice requirements."  (Rec. Doc. 60 at 15).

However, as NCAS and GOH aptly note, Simpson is factually distinguishable from the instant dispute in several important respects.  First, in Simpson, the plan administrator unilaterally determined that a "qualifying event" had occurred based on three interlocutory protective orders entered by the divorce court and a letter from the wife requesting that her "estranged husband" be given no information about the medical services that she received.  Simpson, 414 F.3d at 1204.  Second, upon receipt of her COBRA notice, the wife in Simpson elected

28

coverage, but also objected to the plan administrator's provision of COBRA notice on grounds that no "qualifying event" had occurred.  Id.  Third, after the final divorce decree had been entered, the wife gave proper notice of a "qualifying event."  Id.

In fact, in Simpson, the Tenth Circuit shared the same policy concerns as those the Second Circuit expressed in Philips.  Indeed, the Tenth Circuit cited Philips for the proposition that "COBRA's purpose to ensure beneficiaries continuing affordable health care coverage during transitional periods is best served by relieving, to the extent possible, all interested parties from the responsibility of making legal judgments."  Simpson, 414 F.3d at 1206 (citation omitted).  The Tenth Circuit also noted that "§ 1166(a)(3) places the initial burden on the 'covered employee or qualified beneficiary' to notify the plan administrator of a 'qualifying event' as defined in § 1163(3)."  Id.

It seems fairly clear to this Court that, in Simpson, the plan administrator's *unilateral* determination that a "qualifying event" had occurred, as well as the same policy concerns outlined in Philips, led the Tenth Circuit to its holding. Thus, this Court finds the holdings in Simpson and Philips, although they appear at odds at first glance, can be reconciled when viewed in light of the policy concerns underlying them.  The factual distinctions between the two cases, rather than the

29

law or policy underlying them, account for the divergent outcomes.  Additionally, this Court finds that although <u>Philips</u> is not binding, the Second Circuit's reasoning is sound and persuasive, and, thus, this Court will follow <u>Philips</u> here.

In light of the text of the aforementioned ERISA provisions and applicable precedent, particularly <u>Philips</u>' persuasive holding that "[i]t is the act of the employee telling his employer that the qualifying event has occurred-not the actual occurrence of the qualifying event itself-that triggers the employer's notice obligations under COBRA," 240 F.3d at 178, this Court holds that neither NCAS nor GOH had a duty to investigate Mr. Hall's representations on his Termination Notification Form.  This Court also holds that a qualifying event occurred on June 15, 2005 because that is the date on which Mr. Hall represented that a qualifying event occurred.

Given Mr. Hall's representation that a qualifying event, namely a divorce or legal separation, occurred on June 15, 2005, on June 21, 2005, NCAS properly sent Ms. Hall the COBRA notice that it was obligated to pursuant to 29 U.S.C. § 1166(a)(4).  When Plaintiff returned her COBRA Application, electing coverage and indicating her marital status as "Sep[a]rated," she failed to sufficiently object to either Mr. Hall's representation that a "qualifying event," i.e. divorce or legal separation, had occurred, or the issuance of the COBRA notice.  Ms. Hall's

acquiescence, as well as the Second and Tenth Circuit's concerns that plans not be required to make legal determinations, lead this Court to the opinion that neither NCAS nor GOH had reason to second-guess NCAS's issuance of the June 21, 2005 COBRA notice to Ms. Hall.

Even if, as Plaintiff argues, the qualifying event took place upon entry of the divorce decree on September 9, 2005, Plaintiff's argument that she was entitled to COBRA notice and election as a result of that qualifying event fails.  Plaintiff's argument fails because neither Mr. Hall nor Ms. Hall provided the notice required under 29 U.S.C. § 1166(a)(3) within sixty (60) days of September 9, 2005. Plaintiff did not inform NCAS of the divorce until February 2006, long after the sixty (60) window had closed.

Further, Plaintiff's argument that her delayed notice was excused because of the Plan's failure to furnish her the documents required under 29 U.S.C. § 1166(a)(1) to inform employees and beneficiaries of their rights and obligations under COBRA, is unavailing.  As NCAS indicated, this Court found no legal authority for the proposition that Ms. Hall's duty under § 1166(a)(3) is contingent on the Plan's satisfaction of § 1166(a)(1).  Even if Ms. Hall's duty under § 1166(a)(3) were contingent on the Plan's satisfaction of § 1166(a)(1), the June 21, 2005 COBRA notice she received provided at least some information about her

COBRA rights and obligations, including that her coverage was terminated because of the occurrence of a "qualifying event."[14]

Thus, this Court expressly holds that for the purposes of this Memorandum and all subsequent matters in this dispute, the qualifying event occurred on June 15, 2005.  Notwithstanding our finding as to the date of the qualifying event, and for the reasons aforestated, there may be an alternate argument and supporting facts that would entitle Plaintiff to relief.  If Plaintiff shows that NCAS receipt of her September COBRA premium by October 15, 2005 would entitle her to continued COBRA coverage (see doc. 42, ¶ 61) and that NCAS received her September premium on October 13, 2005 (see doc. 42, ¶ 63), she may be entitled to relief for wrongful denial of benefits.  Accordingly, the claims that Plaintiff makes in Count II pursuant to 29 U.S.C. § 1132(a)(3) are not dismissed for failure to state a claim.

---

[14] The Court notes that the June 21, 2005 COBRA notice also provided specific information about second qualifying events that could have raised certain inferences about all qualifying events: divorce is a second qualifying event and qualified beneficiaries must notify the Plan within sixty (60) days of a second qualifying event in order to continue COBRA coverage.  At the very least, this language undercuts Plaintiff's assertion that "[i]t is unreasonable to think that a participant would know that she was required to provide notice of a qualifying event, when her dependent insurance had already been terminated."  (Rec. Doc. 61 at 12).

Further, the Court considers persuasive GOH's argument that given the Separation Agreement that the Halls signed in January of 2005, any suggestion that Plaintiff "was somehow in the dark as to why her coverage was being terminated" in June of 2005 (see doc. 61 at 12 ("notice provided by NCAS to the plaintiff failed to identify what the qualifying event was that terminated her insurance")) is "disingenuous at best."  (Rec. Doc. 63 at 10).

### C.    NCAS and GOH's Motion to Dismiss Count IV

In Count IV, Plaintiff alleges:

[t]he COBRA notice sent to the [P]laintiff on or about June 21, 2005 was invalid because no qualifying event occurred to trigger such notice . . . [and] Plaintiff is entitled to notice and election of COBRA benefits pursuant to the September 9, 2005 divorce decree; to recover from the defendants, any out-of-pocked medical expenses incurred; and the reinstatement of her insurance.

(Rec. Doc. 42, ¶¶ 81, 85).  In terms of relief requested, Count IV requests one form of relief in addition to those requested in Count II: "that the [D]efendants pay $100.00/day for the failure to comply with the notice requirements after being advised of the date of the divorce."  (Rec. Doc. 42 at 17).

The only potentially significant difference between Counts II and IV, the form of relief requested, is not sufficient to sustain Count IV because, as Defendants have argued, Count IV is based on the same erroneous theory underlying Count II: "the 'qualifying event' occurred on September 9, 2005." (Rec. Doc. 57 at 26). Given this Court's holdings that the qualifying event occurred on June 15, 2005 and that the Halls' failure to provide notice of the divorce decree excused Defendants from providing a COBRA notice following the September 9, 2005 divorce decree entry, Plaintiff cannot obtain a penalty for Defendants' failure to issue a COBRA notice, for reasons described more fully above.  Accordingly, NCAS and GOH's Motions to Dismiss Count IV are granted.

**D.     The Plan's Motion to Dismiss Count V**

Count V alleges that Ms. Hall's "monthly COBRA payments were made timely pursuant to the explicit terms of the Plan and the notices regarding payment sent to Ms. Hall" and that "Ms. Hall's dependent insurance was cancelled contrary to the terms of the Plan and ERISA."  (Rec. Doc. 42, ¶¶ 87-88).  As the Plan notes, the claim in Count V rests partially on the same premise that the claim in Count II did: "the 'qualifying event' occurred on September 9, 2005."  (Rec. Doc. 57 at 26). As this Court has held that the qualifying event occurred on June 15, 2005, this argument fails.

However, as outlined above, Plaintiff may be able to show a set of facts entitling her to relief.  If Plaintiff shows that NCAS receipt of her September premium by October 15, 2005 would entitle her to continued COBRA coverage (see doc. 42, ¶ 61) and that NCAS received her September premium on October 13, 2005 (see doc. 42, ¶ 63), she may be entitled to relief for wrongful denial of benefits.  Accordingly, the claims presented by Plaintiff in Count V are not dismissed for failure to state a claim. GOH's motion to do so is, therefore, denied.

**NOW, THEREFORE, IT IS ORDERED THAT:**

1.     NCAS's Motion to Dismiss Counts I, II, and IV of the Second

       Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (doc. 50) is

**GRANTED** in part and **DENIED** in part:

   a.   NCAS's Motion is **GRANTED** to the extent that Plaintiff's

        claims in Count II pursuant to 29 U.S.C. § 1132(a)(1)(B) are

        dismissed and that Count IV is dismissed.

   b.   NCAS's Motion is **DENIED** in all other respects**.**

2.   GOH's Motion to Dismiss Counts II, IV, and V of the Second

     Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) (doc. 56) is

     **GRANTED** in part and **DENIED** in part:

   a.   GOH's Motion is **GRANTED** to the extent that Plaintiff's

        claims in Count II pursuant to 29 U.S.C. § 1132(a)(1)(B) are

        dismissed and that Count IV is dismissed.

   b.   GOH's Motion is **DENIED** in all other respects.

                              s/ John E. Jones III
                              John E. Jones III
                              United States District Judge