IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLE S. HALL, | : | No.: 4:06-CV-1101 |
| Plaintiff, | : | |
| v. | : | Judge Jones |
| GLENN O. HAWBAKER, INC., et al., | : | |
| Defendants. | : | |

# MEMORANDUM AND ORDER

## February 7, 2007

**THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:**

Pending before this Court is a Motion for Preliminary Injunction ("the Motion"), filed by Plaintiff Nichole S. Hall ("Plaintiff" or "Hall") on June 23, 2006. (Rec. Doc. 6). For the reasons that follow, we will deny the Motion.

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**:

As the parties and this Court are well-acquainted with the procedural history and factual background of the instant action, we will not belabor it here. However, we will set forth the salient facts as we have found them following the November 13, 2006 and December 11, 2006 proceedings that were held on the pending Motion. (See Rec. Docs. 67, 71, 72, 75).

On June 21, 2005, Defendant Capital Administrative Services, Inc. t/d/b/a NCAS ("NCAS") sent Hall a COBRA Qualifying Event Notification ("June 21 Notice"), which indicated that there had been a qualifying event that terminated her coverage through the Glenn O. Hawbaker Inc. Employee Benefit Plan effective June 15, 2005.  (NCAS Exh. 1 at 1).  The June 21 Notice went on to state that Hall could "elect to continue coverage for [her]self . . . " and that if she did so, the monthly premium for individual medical and dental coverage would total $350.22.  (NCAS Exh. 1 at 1).  It indicated that such monthly payments were due "on or before the first day of the coverage period to which it applies," but that a "grace period of 30 days after the first day of the coverage period" would render payments made therein timely.  (NCAS Exh. 1 at 5).  The June 21 Notice also noted in at least three places that if Hall failed to make full payment before the conclusion of the grace period, her continuing coverage would be terminated.  (NCAS Exh. 1 at 2, 5).

In late July of 2005, Hall returned her Continued Group Health Coverage Application ("COBRA application"), electing individual medical and dental coverage, and her fiancé, Paul Morris ("Morris"), remitted a premium payment of $350.22.  (NCAS Exhs. 2, 7).  The COBRA application, which Hall signed, contains an authorization that states in relevant part: "I understand that a beneficiary's continuation coverage ceases on the date he or she . . . fails to pay

2

premium charges when due." (NCAS Exh. 2).

As a result, on July 30, 2005, NCAS sent, and at some point thereafter Hall received, a notice ("July 30 Notice") confirming that Hall's COBRA application had been received. (NCAS Exh. 3). It explained that "[y]our payments will be due the 15th of the previous month for the upcoming month. For example, your February premium will be due January 15." (NCAS Exh. 3; Rec. Doc. 75 at 42-44). The July 30 Notice also stated that Hall should receive a coupon booklet in 2-3 weeks and asked Hall to "pay close attention to the premium periods and due dates on the coupons." (NCAS Ex. 3).

On August 16, 2005, NCAS sent Hall, and at some point thereafter Hall received, an arrears notice ("August 16 Arrears Notice") indicating that she owed a premium of $537.01. (NCAS Exh. 4, Rec. Doc. 75 at 48). Although the August 16 Arrears Notice did not specify the reason such an amount was due or the dates for which such a premium was owed, testimony revealed that such a premium represented one and one-half month's coverage, and resulted from Hall's COBRA coverage beginning in the middle of June of 2005. (Rec. Doc. 71 at 108-09).

Sometime toward the end of August of 2005, Hall received the coupon booklet to which the July 30 Notice referred. (Rec. Doc. 75 at 13).

On or about August 30, 2005, Morris sent NCAS a check for $537.01.

3

(NCAS Exh. 7).  However, Morris testified that as a result of the August 16 Arrears Notice, on August 31, 2005, he also had a conversation with a woman at NCAS, who told him that if he paid $537.01, Hall's COBRA account would be "current."[1] (Rec. Doc. 71 at 131, 150).  Nevertheless, Morris acknowledged that the person he allegedly spoke with on August 31, 2005 did not tell him that Hall would not owe a premium for September of 2005.  (Rec. Doc. 71 at 150).

On September 15, 2005, NCAS sent, and sometime thereafter Hall received, a second arrears notice ("September 15 Arrears Notice").  (NCAS Exh. 5; Rec. Doc. 75 at 19).  The September 15 Notice stated that Hall's premiums were in arrears in the amount of $350.22.  (NCAS Exh. 5).

Thus, as of on or about August 30, 2005, Morris had paid NCAS $350.22 (initial premium sent with application) and $537.01 (premium sent in response to August 16 Arrears Notice) in premiums for Hall's COBRA coverage, for a total of $887.23.  Given that Hall's COBRA coverage premium was $350.22 each month, such payments by Morris had paid for two and one-half month's of coverage, i.e. half of June, all of July, and all of August.  Accordingly, the September 15 Arrears Notice related to September's premium, and the timing of that payment is at the heart of our inquiry here.

---

[1] NCAS does not concede that such a conversation took place.  (Rec. Doc. 79 at 4 n. 2).

As Defendants note, both of Plaintiff's Complaints allege that "[o]n or about September 26, 2005, Mr. Morris mailed a payment of $350.22 for the September payment." (Rec. Docs. 1, ¶ 32; 42, ¶ 33). However, both Morris' testimony and bank records belie this allegation, for somewhat different reasons. (Rec. Doc. 71 at 140; NCAS Exh. 18).

Morris testified that as indicated on the check in question (NCAS Exh. 9), on September 26, 2005, Check No. 1384 was written to pay the October premium. (Rec. Doc. 71 at 138-40). Morris also testified that on October 1, 2005, he wrote Check No. 1383 to pay the November premium. (Rec. Doc. 71 at 138-40). Although Morris does not know when he mailed either of these checks, he testified that he mailed them and the November coupon because "[a]t the time I wanted to be paid ahead, I wanted to pay October and November together." (Rec. Doc. 71 at 140). Thus, Morris' testimony fails to indicate when he remitted the payment for September.

Moreover, Morris' bank records indicate that Check Nos. 1383 and 1384 are out of chronological order when compared to the checks surrounding them sequentially. (NCAS Exh. 18). Check Nos. 1382 and 1385, those immediately preceding and following those at issue here, are dated October 5, 2005, while, as indicated above, Check Nos. 1383 and 1384 are dated October 1, 2005, and

September 26, 2005, respectively. (NCAS Exh. 18). Notably, NCAS' comprehensive discovery of Morris' checking account records for approximately fifty (50) checks surrounding those at issue reveals no other evidence of such sequential inconsistency. (NCAS Exh. 18).

Morris attempted to explain away the sequential inconsistency of Check Nos. 1383 and 1384 by testifying that when he travels, he sometimes removes a few checks from the top of the checkbook to take with him. (Rec. Doc. 71 at 162, 164-65). However, presumably he has done this with other checks included in NCAS' discovery and none of them were out of order. This fact, as well as the overall implausibility of his argument that removing such checks would cause them to be dated after those written prior to the removal, lead us to approach with some incredulity Morris' contention that the dates on Check Nos. 1383 and 1384 are, indeed, the dates on which they were written.

Thus, we also consider the time it took for Morris' payments to NCAS to be delivered by mail. NCAS records demonstrate that prior to Morris' mailing of Check Nos. 1383 and 1384, whenever it occurred, the longest period of time that passed from the time the check was sent by Morris, in Erie, to the time it was received by NCAS, in Harrisburg, was seven (7) to eight (8) days. (GOH Exh. 12). Moreover, this longest delay can be at least partially attributed to the fact that the

check's travel occurred over a weekend in which there was a federal holiday, such that for two (2) of those days, mail was stationary. (GOH Exh. 12).

Given Morris' lack of recall, whether Morris mailed Check Nos. 1383 and 1384 separately or together is unclear. If he mailed the check dated September 26, 2005 on said date, it took seventeen (17) days for it to arrive at NCAS on October 13, 2005. (NCAS Exh. 9). However, more likely given Morris' testimony that he wanted to pay October and November together, as well as the October 13, 2005 receipt stamp on Check Nos. 1383 and 1384, and the November coupon, Morris did not mail the checks until sometime after at least October 1, 2005. In fact, mailing them on or about October 5, 2005, the date on which the checks immediately preceding and following Check Nos. 1383 and 1384 were dated, would render Check Nos. 1383 and 1384's time in the mail, until October 13, 2005, a lapse of approximately eight (8) days. Notably, this time period would also appear to include a federal holiday weekend, comparable to that which occurred when his earlier check that took a similar time period to arrive was in transit.

Thus, the bank records of Morris, as well as the NCAS records relating to the time it took Morris' payments to arrive at NCAS by mail, lead us to conclude that for our purposes here, on or about October 5, 2005, Morris backdated Check

Nos. 1383 and 1384.[2]

As NCAS had not received Hall's September payment by the close of the grace period in which to make it, September 30, 2005, NCAS terminated her coverage on October 12, 2005.[3] (NCAS Exh. 15). As stated above, on October 13, 2005, NCAS received Check Nos. 1383 and 1384. (NCAS Exh. 9). Thus, on same date, NCAS returned the checks to Hall and sent her notice that her COBRA coverage had been terminated effective August 31, 2005. (NCAS Exhs. 13, 14).

**DISCUSSION**:

Plaintiff's Motion (doc. 6) essentially argues that a preliminary injunction should be issued requiring that her health insurance be reinstated, retroactive to August 31, 2005, and that she be afforded a period of time in which to remit all COBRA premiums due subsequent to that date. Her post-hearing submission puts forth two alternative arguments in support thereof: 1) that GOH has "the authority to allow a greater than thirty (30) day grace period in which to make premium

---

[2] We note that Plaintiff's post-hearing submission fails to provide any counterargument to our finding of the facts as outlined here. Indeed, we find it somewhat telling that Plaintiff's submission fails to mention this issue at all.

[3] NCAS employee RaeAnne Mackey testified that such delays between the closing of the grace period and the termination of coverage are common as it normally takes NCAS personnel up to two (2) weeks after the closing of a month to "work" the report of those participants who have not paid the monthly premium and to terminate coverage. (Rec. Doc. 75 at 89).

payments;" and 2) that NCAS breached its fiduciary duty "by providing information that was misleading and inaccurate." (Rec. Doc. 78 at 12). Plaintiff cites two documents in support of her theory that GOH could, and should, have provided Plaintiff a greater than thirty (30) day grace period: the September 15 Arrears Notice and the thirty party service agreement between NCAS and GOH ("TPA"). With regard to her argument as to NCAS, Plaintiff argues that NCAS was acting in a fiduciary capacity during any correspondence between itself and Plaintiff and/or Morris and that NCAS breached that duty by providing misleading and inaccurate information.

Both Defendants spend a significant portion of their post-hearing submissions arguing that Morris' Check Nos. 1383 and 1384, although dated October 1, 2005 and September 26, 2005, respectively, were actually written on or about October 5, 2005. (Rec. Docs. 79 at 5-7; 80 at 7-11). They further argue that such backdating by Morris demonstrates that by the time these checks were written, he had realized his failure to remit a timely payment for September and mailed the aforementioned checks in an attempt to "explain away his failure to timely" do so. (Rec. Doc. 80 at 11). Thus, Defendants maintain that Morris' backdating of the aforementioned checks undercuts all of Plaintiff's arguments in support of the preliminary injunction.

As all parties are well-aware,

> [a] preliminary injunction is an extraordinary remedy which will be granted only if the moving party can demonstrate: (1) the reasonable probability of eventual success in the litigation, and (2) that the movant will be irreparably injured <u>pendente lite</u> if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

<u>Chez Seez III Corp. v. Twp. of Union</u>, 945 F.2d 628, 634 (3d Cir. 1991) (citations and internal quotations omitted).

We are constrained to deny Plaintiff's Motion for a Preliminary Injunction because Plaintiff did not, and can not, demonstrate a reasonable probability of success on the merits of her claims. <u>Chez Seez III Corp.</u>, 945 F.2d at 634. We so conclude as a result of our finding[4] that, for our purposes here, on or about October 5, 2005, Morris backdated Check Nos. 1383 and 1384, which he remitted to NCAS, ostensibly for October and November, but in actuality for September and October. Morris' backdating of the said checks demonstrates <u>scienter</u>. Indeed, the only reason that Morris would have backdated the checks at issue was because knowing that he had failed to timely pay the September 2005 premium, he attempted to make it appear that he had.

---

[4] The reasons for our finding as such are outlined in detail in our factual background/procedural history section, and in the interest of brevity, will not relayed again here.

Throughout this litigation, we have found Plaintiff's arguments in favor of her position creative, and we are not without sympathy for Plaintiff's situation.[5] However, Plaintiff's arguments in favor of a preliminary injunction are unpersuasive.

First, we find that the ancillary documents upon which Plaintiff attempts to rely, the September 15 Arrears Notice and the TPA, cannot be used to require GOH to extend the grace period for September payment beyond September 30, 2005.  Although Plaintiff accurately indicates that 29 U.S.C. § 1162(2)(C) enables COBRA premium payments to be timely if they are made within thirty (30) days of the due date or "within such longer period as applies to or under the plan," we have found no authority, and Plaintiff provides none, that supports the proposition that § 1162(2)(C) enables COBRA participants to use such extraneous materials to <u>override</u> a plan's explicit provisions.

Plaintiff herself concedes that the Glenn O. Hawbaker, Inc. Employee Benefit Plan ("Plan") provides participants a thirty (30) day grace period from the first of every month in which to make the monthly premium payments.  (Rec. Doc. 78 at

---

[5] Indeed, we agree that some of NCAS' written correspondence to Plaintiff could have been more clear as to the status of her account, and we would encourage NCAS to make such correspondence more consumer-friendly.  In our inquiry here, however, Morris' backdating of the checks indicates quite clearly that he realized his own failure to make a timely September payment, and thus, the unclarity in the correspondence was not so great as to support a preliminary injunction here.

7). Thus, her attempt to rely upon the TPA, a document to which neither she nor her fiancé were privy prior to the commencement of this litigation the Plan (docs. 71 at 29, 56-57, 146; 75 at 55), cannot be sustained, particularly in light of the abundant authority cited by GOH that indicates such TPAs cannot be used as such.  See, e.g., Local 56, United Food and Commercial Workers Union v. Campbell Soup Co., 898 F. Supp. 1118, 1136 (D. N.J. 1995) (noting that because the TPA at issue was not a formal plan document, the court would not consider its contents).  Further, the September 15 Arrears Notice can not be viewed in a vaccuum.  As Morris' backdating of the checks at issue demonstrates, the September 15 Arrears Notice was not so ambiguous as to dispel the Morris' knowledge that under the Plan, Plaintiff owed a monthly premium for September and the grace period for receipt of that premium ended September 30, 2005.  Thus, neither can we allow Plaintiff to use such an ancillary document to override the terms of the Plan.

Second, Plaintiff's argument that NCAS breached its fiduciary duty fails. As both Plaintiff and NCAS aptly indicate, to show a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3)(B), Plaintiff must show: 1) Defendant's status as an ERISA fiduciary acting as a fiduciary; 2) a misrepresentation by Defendant; 3) the materiality of that misrepresentation; and 4) detrimental reliance by Plaintiff on the

misrepresentation. Burnstein v. Ret. Account Plan for Emples. of Allegheny Health Educ. & Research Found., 334 F.3d 365, 384 (3d Cir. 2003). Our finding that Morris backdated Check Nos. 1383 and 1384 precludes any finding of detrimental reliance by Plaintiff, and thus, we need not reach a conclusion as to the satisfaction of the other three (3) elements.[6]

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

    1.    Plaintiff's Motion for Preliminary Injunction (doc. 6) is **DENIED**.

        s/ John E. Jones III
        John E. Jones III
        United States District Judge

---

[6] We appreciate NCAS' submission of supplemental authority as to whether NCAS is a fiduciary under the Plan. In light of our view of the instant action, however, we need not reach that question here.