IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NICHOLE S. HALL, | : | No.: 4:06-CV-1101 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Judge Jones |
| | : | |
| GLENN O. HAWBAKER, INC., et al., | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

**September 24, 2007**

**THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:**

Pending before this Court are two Motions for Summary Judgment: the first was filed by Defendants Glenn O. Hawbaker, Inc. ("GOH") and the Glenn O. Hawbaker, Inc. Employee Benefit Plan ("the Plan") on July 30, 2007 (doc. 93), and the second was filed by Defendant Capital Administrative Services, Inc. ("NCAS") on August 15, 2007 (doc. 100).  For the reasons that follow, we will grant the Motions.

**PROCEDURAL HISTORY**:

On May 31, 2006, Plaintiff filed a Complaint arising under the provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq., in the United States District Court for the Middle District of Pennsylvania,

1

with GOH and NCAS as named Defendants.  (Rec. Doc. 1-1).  Prior to the filing of

any Answer(s) or Motion(s) by Defendants, on June 22, 2006, Plaintiff filed an

Amended Complaint, also arising under ERISA, 29 U.S.C. § 1001, et seq., and

naming as Defendants GOH and NCAS.  (Rec. Doc. 5-1).

On June 23, 2006, Plaintiff filed a Motion for Preliminary Injunction

requesting reinstatement of her health insurance.  (Rec. Doc. 6).

GOH and NCAS then filed Motions to Dismiss (docs. 16, 25) portions of the

Amended Complaint, prompting Plaintiff, on September 21, 2006, to file a Motion

to Amend Pleadings (doc. 41-1).  By Order dated September 21, 2006 (doc. 43),

this Court granted Plaintiff's Motion to Amend, and on same date, Plaintiff filed

her Second Amended Complaint (doc. 42).  The Second Amended Complaint also

arises under ERISA, 29 U.S.C. § 1001, et seq.  However, in addition to the original

Defendants, GOH and NCAS, it also names the Plan as a Defendant.

On November 8, 2006, following the filing of new Motions to Dismiss

(docs. 50, 56) portions of the Second Amended Complaint, we granted the same

Motions to the extent that we dismissed Count IV and those claims in Count II that

were brought pursuant to 29 U.S.C. § 1132(a)(1)(B).  (Rec. Doc. 64).

On November 13, 2006 and December 11, 2006, we held proceedings on

Plaintiff's Motion for Preliminary Injunction (doc. 6), and on February 7, 2007, we

entered an Order denying the aforementioned Motion.  (Rec. Doc. 82).  On same

date, Plaintiff filed a Motion for Reconsideration (doc. 83), which was denied on

June 15, 2007 (doc. 87).

On July 30, 2007, GOH and the Plan filed a Motion for Summary Judgment

(doc. 93), and on August 15, 2007, NCAS filed the same (doc. 100).  As both

Motions have been fully briefed, they are ripe for disposition.

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any

material fact and . . . the moving party is entitled to judgment as a matter of law."

FED. R. CIV. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340

(3d Cir. 1990).  The party moving for summary judgment bears the burden of

showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357

(3d Cir. 1992).  Summary judgment should not be granted when there is a

disagreement about the facts or the proper inferences that a fact finder could draw

from them.  See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir.

1982).

Initially, the moving party has a burden of demonstrating the absence of a

genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).  This may be met by the moving party pointing out to the court that there is

an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  <u>See</u> <u>id.</u> at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  <u>See</u> Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  <u>See</u> <u>Celotex</u>, 477 U.S. at 322-23.

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  <u>Pastore v. Bell Tel. Co. of Pa.</u>, 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." <u>Big Apple BMW, Inc. v. BMW of North America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

4

requirement is that there be no *genuine* issue of *material* fact."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  "As to materiality, the

substantive law will identify which facts are material."  Id. at 248.  A dispute is

considered to be genuine only if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party."  Id.

**STATEMENT OF RELEVANT FACTS:**

As the parties and this Court are well-acquainted with the factual

background of the instant action, we will not belabor it here.  However, we will

briefly set forth the salient, undisputed[1] facts.  (See Rec. Docs. 82, 95, 98, 101,

---

[1] As NCAS aptly notes, in the context of intellectual property actions that were to be tried before a jury, the Court of Appeals for the Third Circuit has indicated that the standards of review applicable to motions for preliminary injunctions and those for summary judgment are different, and, thus, that the credibility determinations made in resolving the former cannot be relied upon in resolving the latter.  See Doeblers' Pa. Hybrids, Inc. v. Doebler, 442 F.3d 812, 820 (3d Cir. 2006) (citing Country Floors v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1991)).

However, Doebler and Country Floors are distinguishable on at least two grounds.  First, both cases involved trademark disputes, and the infrequency of summary judgment entry in such disputes appears to have been a critical aspect in the decisions.  See Doebler, 442 F.3d at 820 ("'Failure to strictly observe the principles governing summary judgment becomes particularly significant in a trademark or tradename action, where summary judgments are the exception.'") (quoting Country Floors, 930 F.2d at 1062-63).  Second, and more significantly, in both Doebler and Country Floors, the ultimate fact-finder was to be a jury, and in the instant dispute, the ultimate fact-finder would be this Court.

Moreover, because Plaintiff's responses to the pending Motions do not provide a scintilla of new proposed evidence and/or testimony to refute our previous findings, this Court, as the ultimate fact-finder, fails to see how the credibility determinations that we reached based upon the two days of testimony on the Motion for Preliminary Injunction would be disturbed if we were to allow this matter to proceed to trial.  Indeed, we think it reasonable to assume that the testimony at any trial in this matter would be substantially the same as that which we heard during the hearing on the Motion for Preliminary Injunction, wherein all parties had a full and

103).

By way of introduction as to the parties, Plaintiff is an adult individual residing at 3645 Depot Road, Erie, Pennsylvania 16510. (Rec. Docs. 95, ¶ 1; 98, ¶ 1). GOH sponsors and maintains the Glenn O. Hawbaker, Inc. Employee Benefit Plan ("the Plan"), which is a self-funded employee benefit plan for employees and beneficiaries of GOH. (Rec. Docs. 95, ¶¶ 2, 4; 98, ¶¶ 2, 4). The specific terms of the Plan are outlined in "The Glenn O. Hawbaker Employee Benefit Plan, Plan Document, Summary Plan Description" ("SPD"). (Rec. Docs. 95, ¶ 5; 98, ¶ 5). As noted in the SPD, GOH is not only the employer, but also the Plan Administrator, and NCAS is the "third-party Claims Administrator." (Rec. Docs. 95, ¶¶ 2-3; 98, ¶¶ 2-3; 102-2 at 18). In this capacity, NCAS is responsible for administering the Plan's obligations with respect to COBRA, including the provision of appropriate notices and the processing of premium payments.[2] (Rec. Docs. 95, ¶ 3; 98, ¶ 3).

---

fair opportunity to litigate that issue. Thus, Plaintiff's opposition to the instant Motions, on the ground that genuine issues of fact remain, essentially amounts to a request for a "redo" of the hearing on the Motion for Preliminary Injunction, and this we will not allow. Simply stated, we think it absurd to stand on ceremony and require such a "redo."

Accordingly, our summary of the relevant, undisputed facts will include those findings that we reached following the hearing on the Motion for Preliminary Injunction, including, most notably, those as to when Plaintiff's September payment was due and paid. We recognize that Plaintiff maintains that such issues remain disputed, but for all of the reasons herein stated, we see no viable support for such assertions.

[2] Notably, GOH had the discretion to make the ultimate determinations as to whether participants' coverage was terminated. (Rec. Doc. 71 at 47). However, in this case, GOH chose not to disturb NCAS' termination of Plaintiff's coverage. Id. at 23.

Turning to the events that led to the dispute between the aforementioned

parties, on November 7, 1993, Plaintiff and Michael Hall ("Mr. Hall") married.

(Rec. Docs. 95, ¶ 6; 98, ¶ 6).  At all times relevant to the instant dispute, Mr. Hall

was employed by GOH.  (Rec. Docs. 95, ¶ 7; 98, ¶ 7).  As an employee of GOH,

Mr. Hall and his beneficiaries, including Plaintiff, were entitled to employee

benefits, such as health insurance, from the Plan.  (Rec. Docs. 95, ¶ 8; 98, ¶ 8).

Thus, Plaintiff had health insurance through GOH for some period of time

prior to the circumstances that led to the instant dispute.  (Rec. Docs. 95, ¶ 9; 98, ¶

9).  While Plaintiff was insured under the Plan, she was the victim of recurrent

thyroid cancer and had two surgeries, as well as testing related to her cancer.  (Rec.

Docs. 95, ¶ 10; 98, ¶ 10).

In 2004, Mr. Hall filed for divorce from Plaintiff in New York.  (Rec. Docs.

95, ¶ 11; 98, ¶ 11).  On January 6, 2005, Mr. Hall and Plaintiff signed a Separation

Agreement relating to equitable distribution of their marital property.  (Rec. Docs.

95, ¶ 12; 98, ¶ 12).  The Separation Agreement provided that the parties would

"agree to remain separated . . . for a period of six (6) months after the execution of

the Agreement, or June 1, 2005, so that the Wife can continue to obtain medical

insurance for that period of time from the [H]usband."  (Rec. Docs. 95, ¶ 13; 98, ¶

13).  In conjunction with the Separation Agreement, Ms. Hall knew that she was

eligible to continue her health insurance under the Plan.  (Rec. Docs. 95, ¶ 14; 98, ¶ 14).

On June 14, 2005, Mr. Hall returned revised insurance forms to GOH in which he requested that Plaintiff and Bailey Hall, their child, be removed from the Plan, described his marital status as "Single," and further certified that he was "not now married."  (Rec. Docs. 95, ¶ 15; 98, ¶ 15).  As a result of Mr. Hall's notice of a qualifying event, GOH prepared and forwarded to NCAS a Termination Notification Form.  (Rec. Docs. 95, ¶ 16; 98, ¶ 16).  Upon receipt of the Termination Notification Form, on or about June 21, 2005, NCAS sent the required COBRA Qualifying Event Notification ("COBRA Notification") to Plaintiff. (Rec. Docs. 95, ¶ 17; 98, ¶ 17).

In late June of 2005, Plaintiff received and read the COBRA Notification, which indicated that Plaintiff's coverage under the Plan had terminated on June 15, 2005.  (Rec. Docs. 38 at 37-38; 95, ¶ 18; 98, ¶ 18).  Thus, at that time, she was aware that her coverage under the Plan had terminated on June 15, 2005.[3]  (Rec. Doc. 38 at 38).

The COBRA Notification also advised Plaintiff of various other details.  For

---

[3] Nevertheless, Plaintiff contends that she was not clear as to what the effective start date of her COBRA coverage would be if she elected it.  (Rec. Doc. 98, ¶ 19).

example, it indicated that "[t]o continue coverage, you must complete and submit the application that is enclosed with this letter to NCAS within 60 days from either the date of this letter or your coverage term date (whichever is later)." (Rec. Docs. 95, ¶ 20; 98, ¶ 20). It went on to state that if Ms. Hall elected coverage for herself, the monthly premium for individual medical and dental coverage would total $350.22, and further advised that "[y]our completed application should include a premium payment in order to activate coverage that terminated on the termination date listed above." (Rec. Docs. 95, ¶ 21; 98, ¶ 21). The COBRA Notification indicated that such monthly payments were due "on or before the first day of the coverage period to which it applies," but that a "grace period of 30 days after the first day of the coverage period" would render payments made therein timely. (Rec. Docs. 95, ¶ 22; 98, ¶ 22). It also noted in at least three places that if Plaintiff failed to make full payment before the conclusion of the grace period, her continuing coverage would be terminated. (Rec. Docs. 95, ¶ 23; 98, ¶ 23).

In late July of 2005, Plaintiff returned her Continued Group Health Coverage Application ("COBRA Application") to NCAS, electing individual medical and dental coverage, and her fiancé, Paul Morris ("Mr. Morris"), remitted a premium payment of $350.22. (Rec. Docs. 95, ¶ 24; 98, ¶ 24). The COBRA Application, which Plaintiff signed, contains an authorization that states in relevant

part: "I understand that a beneficiary's continuation coverage ceases on the date he

or she . . . fails to pay premium charges when due."  (Rec. Docs. 95, ¶ 25; 98, ¶

25).  Thus, Plaintiff knew that if she failed to make a monthly premium payment,

her coverage would be terminated.  (Rec. Docs. 95, ¶ 26; 98, ¶ 26).

On July 30, 2005, NCAS sent, and at some point thereafter Plaintiff

received, a notice ("July 30 Notice") confirming that Plaintiff's COBRA

Application had been received.  (Rec. Docs. 95, ¶ 27; 98, ¶ 27).  The July 30

Notice explained that "[y]our payments will be due the 15th of the previous month

for the upcoming month.  For example, your February payment will be due January

15."  (Rec. Docs. 95, ¶ 28; 98, ¶ 28).  The July 30 Notice also stated that Plaintiff

should receive a coupon booklet in 2-3 weeks and asked Plaintiff to "pay close

attention to the premium periods and due dates on the coupons."  (Rec. Docs. 95, ¶

29; 98, ¶ 29).

In August of 2005, Plaintiff received a new insurance card for the

prescription drug benefit following her election of medical coverage from

Culbertson Financial Services, an insurance broker for GOH.  (Rec. Docs. 95, ¶ 30;

98, ¶ 30).  Also enclosed with her new insurance prescription card was a second

COBRA Notification relative to Plaintiff's election of continuation medical

coverage under the Plan.  (Rec. Docs. 95, ¶ 31; 98, ¶ 31).

On August 16, 2005, NCAS sent, and at some point thereafter Plaintiff received, an arrears notice ("August 16 Arrears Notice") indicating that she owed a premium of $537.01.  (Rec. Docs. 95, ¶ 32; 98, ¶ 32).  The $537.01 premium represented the amount due for one and one-half months of coverage, and resulted from Plaintiff's COBRA coverage beginning in the middle of June of 2005.  (Rec. Docs. 95, ¶ 33; 98, ¶ 33).  On or about August 30, 2005, Mr. Morris sent NCAS a check for $537.01, which was received by NCAS on or about September 7, 2005.  (Rec. Docs. 95, ¶ 35; 98, ¶ 35).

Thus, as of on or about August 30, 2005, Mr. Morris had paid NCAS $350.22 (initial amount sent with COBRA Application) and $537.01 (amount sent in response to August 16 Arrears Notice) in premiums for Plaintiff's COBRA coverage, for a total of $887.23.  (Rec. Docs. 95, ¶ 39; 98, ¶ 39).  "Given that Hall's COBRA coverage premium was $350.22 each month, such payments by Morris had paid for two and one-half months of coverage, i.e. half of June, all of July, and all of August."  (Rec. Doc. 82 at 4).

Sometime toward the end of August of 2005, Plaintiff received the coupon booklet to which the July 30 Notice referred.  (Rec. Docs. 95, ¶ 34; 98, ¶ 34).  The coupon booklet contained a coupon for the September payment.  (Rec. Docs. 95, ¶ 42; 98, ¶ 42).

11

On September 15, 2005, NCAS sent, and sometime thereafter Plaintiff received, a second arrears notice ("September 15 Arrears Notice").  (Rec. Docs. 95, ¶ 36; 98, ¶ 36).  The September 15 Arrears Notice stated that Plaintiff's premiums were in arrears in the amount of $350.22.  (Rec. Docs. 95, ¶ 37; 98, ¶ 37).  Because Plaintiff had paid for two and one-half months of coverage, and her coverage started on June 15, 2005, it is clear that the September 15 Arrears Notice was sent because Plaintiff had not paid for coverage in September.[4]  (Rec. Doc. 82 at 4). The September 15 Arrears Notice advised Plaintiff that her "continuation of coverage may be cancelled as of next month's closing date if this balance is not paid."  (Rec. Docs. 95, ¶ 38; 98, ¶ 38).

However, for all of the reasons thoroughly outlined in our February 7, 2007 Memorandum and Order (doc. 82),[5] which is specifically incorporated herein by reference,  Plaintiff did not make a timely payment for September 2005 by the close of the grace period, September 30, 2005.  Rather, "on or about October 5, 2005, [Mr.] Morris backdated Check Nos. 1383 and 1384," to make it appear as if

---

[4] As determined in our February 7, 2007 Memorandum and Order, Plaintiff's September 2005 payment was due by September 1, 2005, and the grace period for making a timely payment ended on September 30, 2005.  (See Rec. Doc. 82).

[5] By way of example, we note that the checks immediately preceding and following the checks at issue are dated October 5, 2005, and that no other such sequential anomalies were present in Mr. Morris' bank records.  (Rec. Docs. 82; 95, ¶ 47; 98, ¶ 47).

he had written them on October 1, 2005, and September 26, 2005, respectively. (Rec. Docs. 82 at 7-8; 95, ¶ 45; 98, ¶ 45).  Sometime thereafter, Mr. Morris mailed Check Nos. 1383 and 1384 to NCAS in an attempt to make it appear as though September's premium had been timely remitted.  On October 13, 2005, seventeen (17) days after September 26, 2005, NCAS received Check Nos. 1383 and 1384. (Rec. Docs. 95, ¶ 38; 98, ¶ 38).

Because NCAS had not received Checks No. 1383 and 1384 prior to the final date on which payment for September 2005 would be accepted, September 30, 2005, on October 12, 2005, NCAS terminated Plaintiff's COBRA coverage. (Rec. Docs. 82; 95, ¶ 49; 98, ¶ 49).  Thus, on or about October 12, 2005, Plaintiff was provided notice that her insurance was being cancelled for non-payment and was notified that she could contact NCAS' COBRA department via telephone in regards to the termination.  (Rec. Docs. 95, ¶ 51; 98, ¶ 51).  On same date, she was also forwarded a Certificate of Health Insurance Creditable Coverage for the period of June 15, 2005 through August 31, 2005.  (Rec. Docs. 95, ¶ 50; 98, ¶ 50).

As a result of the October 13, 2005 receipt of Check Nos. 1383 and 1384, on same date, NCAS sent Plaintiff a second written notification about terminating her COBRA coverage and also returned Check Nos. 1383 and 1384.  (Rec. Docs. 95, ¶ 53; 98, ¶ 53).

13

From June 21, 2005, through October 12, 2005, neither Plaintiff nor Mr. Morris had any conversations with anyone at GOH regarding when Plaintiff's COBRA premium payments were due.  (Rec. Docs. 95, ¶ 54; 98, ¶ 54).  Further, during the same period, Plaintiff did not request a copy of the SPD from GOH. (Rec. Docs. 95, ¶ 56; 98, ¶ 56).

However, in August 2005, Mr. Morris may have had a telephone conversation with a representative of NCAS.  The parties dispute the existence of said conversation, as well as the specific content and implications thereof, but for reasons outlined below, said details are immaterial to disposition of the instant Motions.  Thus, we need not further delve into them here.

Following the termination of Plaintiff's COBRA coverage, the parties engaged in substantial written correspondence.  A review of the pertinent communications follows.

By letter dated February 6, 2006, Plaintiff contacted NCAS, through her attorney Bernard Cantorna, Esq. ("Mr. Cantorna"), to advise NCAS that Plaintiff had sent the September and October premiums, was continuing to send monthly premiums, had not received notice that she was in arrears, and was requesting reinstatement of her insurance benefits.  (Rec. Docs. 95, ¶ 57; 98, ¶ 57).  Mr. Cantorna further requested in his letter that NCAS "provide a written explanation

14

as to any continued denial of her insurance coverage and provide copies of any and all documents that relate to this issue."[6]  (Rec. Docs. 95, ¶ 58; 98, ¶ 58).  By letter dated February 16, 2006, Mr. Cantorna again contacted NCAS, this time to express his belief that the qualifying event occurred on September 9, 2005, not on June 15, 2005, and to again request that Plaintiff's insurance be reinstated.  (Rec. Docs. 95, ¶ 59; 98, ¶ 59).

On or about February 27, 2006, NCAS advised Mr. Cantorna that Plaintiff's written appeal had been forwarded to GOH and that a detailed response would be forthcoming from the group's broker of record.  (Rec. Docs. 95, ¶ 60; 98, ¶ 60). On or about March 8, 2006, Mr. Cantorna received a memorandum from GOH, indicating the qualifying event for termination as divorce or legal separation, listing a chronology of events regarding Plaintiff's claim, and providing copies of the Termination Notification Form and COBRA Notification.  (Rec. Docs. 95, ¶ 61; 98, ¶ 61).

By letter dated March 21, 2006 to NCAS, Mr. Cantorna acknowledged receiving "a detailed response from [GOH] to my letter of February 15, 2006," and

---

[6] Although Plaintiff does not explicitly admit that this was first written request for any Plan information (see docs. 101, ¶ 12; 103, ¶ 12), she does not specifically deny this portion of the allegation or offer any factual basis to support a denial.  Accordingly, we find that Plaintiff has admitted that the February 6, 2006 letter from Mr. Cantorna was the first written request to NCAS for Plan documents.

requested that NCAS provide him copies of the August 15, 2005 and September 15, 2005 Arrears Notices.  (Rec. Docs. 95, ¶ 62; 98, ¶ 62).

By letter dated April 26, 2006, Neva Stanger, Esq. ("Ms. Stanger"), counsel to GOH, provided Mr. Cantorna further written explanation as to the termination of Plaintiff's COBRA coverage due to untimely payment of premiums.  (Rec. Docs. 95, ¶ 63; 98, ¶ 63).

By letter dated May 9, 2006, Mr. Cantorna specifically requested that NCAS provide him a copy of the SPD.  (Rec. Docs. 95, ¶ 64; 98, ¶ 64).  The letter was not addressed to GOH, nor was GOH copied thereon.  (Rec. Doc. 98, ¶ 64).

In July of 2006, around the filing of the initial set of Motions to Dismiss, Mr. Cantorna received a copy of the SPD and various notices from NCAS' counsel.  (Rec. Docs. 101, ¶ 13; 103, ¶ 13).


**DISCUSSION**:

Following our November 8, 2006 Memorandum and Order (doc. 64), the following claims remain viable against both GOH and NCAS: Count I, which alleges breach of fiduciary duty; Count II insofar as it alleges wrongful denial of benefits under 29 U.S.C. § 1132(a)(3); and Count III, which alleges failure to provide Plaintiff Plan documents on request, as required by 29 U.S.C. §§

1024(b)(4) and 1132(c).  (See Rec. Doc. 42).  Additional claims remain viable

against GOH and/or the Plan: Count V, which alleges that the Plan wrongfully

denied Plaintiff benefits; Count VI, which requests that GOH and the Plan be

required to afford Plaintiff equitable relief; and Count VII, which alleges that GOH

and the Plan committed COBRA violations.  See id.

In their Motions, NCAS and GOH seek summary judgment on all remaining

claims against them.  In support thereof, they offer a number of well-founded

arguments.  However, as we will rely heavily upon said arguments during our

analysis to follow, we see no reason to delineate them separately here.

In response, Plaintiff offers both factual and legal bases as precluding the

entry of summary judgment.  However, her argument that genuine factual disputes

remain directly contradicts our February 7, 2007 (doc. 82) findings, and, as

previously noted, she fails to offer any new proposed evidence and/or testimony

that would refute said findings.[7]  Thus, as indicated by our summary of the relevant

undisputed facts, we find unpersuasive Plaintiff's contention that genuine issues of

material fact remain.  Further, although we find that some of the legal arguments

---

[7] We note that the concerns of NCAS' counsel as to potential Rule 11 ramifications (docs. 102 at nn.6-7; 106 at n. 4) are well-taken.  Indeed, our entry of summary judgment in this action may prevent Mr. Cantorna from facing a further ethical dilemma involving how to present Mr. Morris' testimony at trial.  Moreover, at this juncture, we offer no opinion on whether the reliance upon those discredited portions of Mr. Morris' testimony to oppose these Motions went, as NCAS' counsel posits, a step too far.

that Plaintiff offers in opposition to the Motions are simply attempts to re-litigate certain legal determinations that we have already made, we will now analyze thoroughly those issues upon which we have not ruled and briefly reiterate our findings on the issues upon which we have.

Count I alleges that both NCAS and GOH breached their fiduciary duty, and Plaintiff's opposition (doc. 99 at 3) to the instant Motions makes it clear that she intended to allege a breach in violation of 29 U.S.C. § 1104(a). All parties agree that in order to show such a breach, Plaintiff must prove: "(1) the defendant's status as an ERISA fiduciary acting as a fiduciary; (2) a misrepresentation on the part of the defendant; (3) the materiality of that misrepresentation; and (4) detrimental reliance by the plaintiff on that misrepresentation." Burstein v. Ret. Account Plan for Employees of Allegheny Health Educ. & Research Fund., 334 F.3d 365, 384 (3d Cir. 2003).

Applying these elements to GOH, we hold that Count I must be dismissed as against GOH for two alternative reasons. First, Plaintiff's allegations in Count I implicate only NCAS, rendering summary judgment as to GOH appropriate because of the logical conclusion that without any alleged action by GOH relating to this claim, none of the aforementioned elements can be satisfied. See Newkirk v. Sheers, 834 F. Supp. 772, 784 (E.D. Pa. 1993) ("We will grant summary

judgment in favor of all other defendants named in the plaintiffs' Amended

Complaint on this issue since no allegations were specifically brought against them

by plaintiffs.").  Indeed, although we recognize that Count I's heading names both

NCAS and GOH, the only averment therein that alleges action by a specific

Defendant involves NCAS.  All other averments refer only generically to "the

defendant."  Although vague, the use of the singular case, combined with the

earlier reference to NCAS, certainly seems to indicate that NCAS is the Defendant

to which Plaintiff refers.

Second, even assuming arguendo that Plaintiff's Complaint sufficiently

alleges GOH involvement in Count I, in light of our February 7, 2007 finding that

Mr. Morris backdated the check that he submitted to NCAS to pay for September

2005 coverage,[8] no finding of detrimental reliance by Plaintiff is possible.[9]  Rather, such backdating necessarily demonstrates Mr. Morris' scienter as to not only the final date on which payment would be accepted, but also his failure to make payment prior thereto.

Turning, then, to whether Plaintiff has made out a claim for breach of fiduciary duty against NCAS, we hold that she has not, again for two reasons. First, we find that NCAS was not acting in a fiduciary capacity in any of its communications with Plaintiff.  We so find because "persons who perform purely ministerial tasks, such as claims processing and calculation, cannot be fiduciaries because they do not have discretionary roles."  Confer v. Custom Engineering Co., 952 F.2d 34, 39 (3d Cir. 1991).  In the instant action, NCAS performed ministerial

---

[8] Our finding that Mr. Morris backdated Check Nos. 1383 and 1384 was based upon numerous pieces of evidence, and we see no reason to restate in its entirety our analysis related thereto.  (See Rec. Doc. 82).  However, given the significance of said finding to our decision here, our initial analysis of this issue is specifically incorporated herein by reference.  Id. Additionally, we will briefly note the primary pieces of evidence upon which our conclusion was based: 1) Mr. Morris' testimony that Check Nos. 1383 and 1384 were to pay for the October and November 2005 premiums, which is inexplicable given his failure to explain when the September 2005 was paid and inconsistent with Plaintiff's current contention that Check No. 1384 was timely submitted to pay for September coverage; 2) the checks immediately preceding and following the checks at issue were dated October 5, 2005, and despite Mr. Morris' proffered explanation, no other such sequential inconsistencies were found in his relevant bank records; and 3) if Check No. 1384 had been written on the date appearing thereon, September 26, 2005, it required seventeen (17) days to reach NCAS, which was significantly longer than it took for NCAS to receive any other correspondence from Plaintiff.

[9] Accordingly, we need not analyze the other three elements of a breach of fiduciary duty.

20

tasks, such as claims processing for GOH, and discretionary decisions ultimately rested with GOH.  Moreover, even assuming <u>arguendo</u> that the purported conversation between Mr. Morris and an NCAS representative occurred as Mr. Morris contends, it does not render NCAS a fiduciary because the authority upon which Plaintiff relies to support said assertion clearly states that "when a <u>plan administrator</u> explains plan benefits <u>to its employees</u>, it acts in a fiduciary capacity."  <u>United Automobile Workers, Local No. 1697 v. Skinner Engine Co.</u>, 188 F.3d 130, 148 (3d Cir. 1999) (emphasis added).  Clearly such is not the case here where GOH is the employer and Plan Administrator,[10] and NCAS is merely the third-party Claims Administrator.

Second, even assuming <u>arguendo</u> that NCAS was acting as a fiduciary in its interactions with Plaintiff, no detrimental reliance can be shown given Mr. Morris' backdating of checks and the inferences logically drawn therefrom, <u>e.g.</u> he was well-aware of the final September due date and his failure to meet it.

Thus, we will dismiss Count I in its entirety.

In Counts II and V, Plaintiff alleges wrongful denial of benefits by NCAS,

---

[10] Notably, Plaintiff appears to concede that GOH is the Plan Administrator in her brief opposing GOH and the Plan's Motion.  (<u>See</u> Rec. Doc. 99 at 12).

GOH, and the Plan.[11]  In her briefs opposing the Motions as they relate to these

Counts, Plaintiff essentially re-asserts an argument already rejected by this Court:

Plaintiff had until at least October 15, 2005 to render a timely payment for

September 2005 coverage.  (See Rec. Doc. 99 at 11).  We once again see no reason

to engage in a second thorough analysis of an issue already decided.  (See Rec.

Doc. 82).  However, given the gravity of this issue at it relates to disposition of the

instant Motions, we specifically incorporate herein our earlier discussion of this

issue, id., and we will briefly reiterate why Plaintiff's aforementioned argument

fails.  In short, the ancillary documents upon which Plaintiff attempts to rely, the

Third-Party Service Agreement ("TPA") and the September 15 Arrears Notice,

cannot be used to require GOH, the entity with the ultimate right to determine

whether Plaintiff's COBRA coverage was properly terminated, to extend the grace

period for September payment beyond September 30, 2005.  The TPA, "a

document to which neither she nor her fiancé were privy prior to the

commencement of this litigation the Plan (docs. 71 at 29, 56-57, 146; 75 at 55),"

cannot be so used to override explicit Plan provisions, "particularly in light of the

_____

[11] Following our November 8, 2006 Memorandum and Order (doc. 64), Count II is directed at NCAS and GOH and remains only insofar as it is brought pursuant to 29 U.S.C. § 1132(a)(3), and Count V is directed at the Plan and is presumably brought pursuant to 29 U.S.C. § 1132(a)(1)(B).  However, as GOH and the Plan aptly note, the relief requested in both Counts is identical, and the basic claim in both is the same.  Thus, we will jointly dispose of the portions of the Motions challenging these two Counts.

abundant authority cited by GOH that indicates such TPAs cannot be used as such.

See, e.g., Local 56, United Food and Commercial Workers Union v. Campbell

Soup Co., 898 F. Supp. 1118, 1136 (D. N.J. 1995) (noting that because the TPA at

issue was not a formal plan document, the court would not consider its contents)."

(See Rec. Doc. 82 at 12 (emphasis added)).  Further, the September 15 Arrears

Notice cannot be so used because it does not exist in a vacuum, and the

circumstances of this case demonstrate that it was clearly "not so ambiguous as to

dispel [Mr.] Morris' knowledge that under the Plan, Plaintiff owed a monthly

premium for September and the grace period for receipt of that premium ended

September 30, 2005."  Id.

Given that the latest date upon which timely payment for September 2005

coverage could be rendered was September 30, 2005, that Mr. Morris wrote Check

Nos. 1383 and 1384 on or about October 5, 2005, and that NCAS did not receive

them until on or about October 13, 2005, NCAS' termination of Plaintiff's

COBRA coverage on October 12, 2005, and GOH's decision not to reinstate it

following the untimely September payment, were proper.  Accordingly, all of

Plaintiff's claims for wrongful denial of benefits, i.e. Counts II and V, will be

dismissed.

Next, we turn to consideration of Count III, Plaintiff's claims against NCAS

and GOH for failure to provide her the requested Plan information, as required by

29 U.S.C. §§ 1024(b)(4) and 1132(c).  The relevant provision of 29 U.S.C. § 1024

reads: "The administrator shall, upon written request of any participant or

beneficiary, furnish a copy of the latest updated summary plan description, and the

latest annual report, any terminal report, the bargaining agreement, trust agreement,

contract, or other instruments under which the plan is established or operated . . . ."

29 U.S.C. § 1024(b)(4).  Moreover, 29 U.S.C. § 1132(c)(1)(B), the enforcement

provision, states that any administrator:

> who fails or refuses to comply with a request for any information which such
> administrator is required by this title to furnish to a participant or beneficiary
> . . . by mailing the material requested to the last known address of the
> requesting participant or beneficiary within 30 days after such request may
> in the court's discretion be personally liable to such participant or
> beneficiary in the amount of up to $ 100 a day from the date of such failure
> or refusal . . . .

29 U.S.C. § 1132(c)(1)(B).

In support of her assertions that 29 U.S.C. § 1024(b)(4) has been violated

and that relief under 29 U.S.C. § 1132(c)(1)(B) is warranted, Plaintiff argues that

she sent numerous written requests for information and that she did not receive a

copy of the SPD until sometime in July of 2006, when it was filed in conjunction

with a Motion to Dismiss.   However, as Plaintiff well-recognizes, only plan

administrators are penalized for failing to timely provide such documents as the

24

SPD under 29 U.S.C. § 1132(c). (<u>See</u> Rec. Doc. 104 at 12 ("29 U.S.C. § 1132C

provides that a <u>plan administrator</u> may be required to pay a beneficiary penalties of

up to one hundred dollars a day" for failure to comply with 29 U.S.C. § 1024.)).

<u>See</u> <u>also</u> <u>Colarusso v. Transcapital Fiscal Sys.</u>, 227 F. Supp. 2d 243, 257 (D.N.J.

2002); <u>Towner v. CIGNA Life Ins. Co.</u>, 419 F. Supp. 2d 172, 185 (D. Conn. 2006).

As GOH is the sole Plan Administrator, we will dismiss Count III as against NCAS

and the Plan.

Thus, we turn to the only cognizable request for information that could be

construed as directed to GOH: Plaintiff asserts on February 6, 2006, she made a

written request for, <u>inter alia</u>, documents related to denial of her insurance

coverage, and that said request was to NCAS and Daniel Hawbaker.  (Rec. Doc. 99

at 12).  However, upon our review of the February 6, 2004 letter, we note that it

was only addressed to NCAS, and that Daniel Hawbaker was merely sent a carbon

copy.[12]  Accordingly, we find that the February 6, 2004 letter did not properly

request a copy of the SPD from the Plan Administrator, GOH.  Further, we find

---

[12] A separate cover letter for this carbon copy was addressed to Daniel Hawbaker, but it requested only: "Anything your office can do that will allow these people to pay the premiums and have the insurance reinstated, is appreciated."  (Rec. Doc. 99-2 at 3).  As provision of the SPD to Plaintiff cannot fairly be said to have facilitated the reinstatement of Plaintiff's insurance, Plaintiff's sole written request to GOH cannot be said to have requested the SPD.

that as no written correspondence to GOH so requested,[13] we will dismiss Count III as against GOH.

Thus, Count III will be dismissed in its entirety.

Next, we turn to Counts VI and VII, Plaintiff's claims against GOH and the Plan for equitable relief and COBRA violations, respectively.  As to Count VI, Plaintiff simply incorporates her arguments opposing dismissal of Counts I and II, and as to Count VII, Plaintiff fails to offer any opposition to dismissal.  (See Rec. Doc. 99 at 15).  Because GOH and the Plan's requested dismissal of Count VII is not opposed, we will dismiss the same on that basis.  Moreover, having rejected herein all of Plaintiff's arguments as to Counts I and II, and finding that no viable claims remain, we see no basis for granting of equitable relief.  Thus, we will dismiss Count VI.

In conclusion, given that this Court would have been the fact-finder had this action gone to trial, and that after a two-day hearing on a Motion for Preliminary Injunction, the fact-finding and merits analysis which necessarily followed led us to conclude that Plaintiff was not entitled to a preliminary injunction, it should

---

[13] In the interest of completeness, we note that Plaintiff did not specifically request the SPD until her May 9, 2006 correspondence to NCAS, a letter to which GOH was not even copied.  (See Rec. Doc. 97-7 at 35).  Thus, we see no reason that such a request could be construed as being made to GOH, and, thus, it provides no ground for finding a violation of 29 U.S.C. §§ 1024(b)(4).

26

come as no surprise that we will grant summary judgment in all Defendants' favor. Indeed, although we continue to sympathize with Plaintiff, she has offered us no cause to suggest that a "redo" of the hearing would lead us to any conclusions that differ from those we have already reached.  Accordingly, it would be absurd to deny the entry of summary judgment at this juncture.

As our determinations herein dismiss all remaining claims that Plaintiff had made against all Defendants, an appropriate Order closing this case shall issue.